IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| SHARON K. LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 14-4072-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sharon Lewis seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in finding that plaintiff could perform her past relevant work as a housekeeper, and (2) the Appeals Council erred in failing to consider new and material evidence. I find that the substantial evidence in the record as a whole supports the ALJ's decision. Therefore, plaintiff's motion for summary judgment will be denied.

## I.   BACKGROUND

On June 14, 2011, plaintiff applied for disability benefits alleging that she had been disabled since November 15, 2008, later amended to January 21, 2011 (Tr. at 12, 247, 249). Plaintiff alleges an inability to work based on chest pains, a back injury, degenerative disc disease, pain and disorders of the back, high blood pressure, a neck injury, depression, anxiety, and breathing problems. Plaintiff's application was denied on September 10, 2011. On September 25, 2012, a hearing was held before an Administrative Law Judge. On October 29, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On January 28, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

Case 2:14-cv-04072-REL   Document 27   Filed 06/30/15   Page 2 of 55

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Deborah Determan, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1976 through 2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 529.00 | 1993 | $ 97.88 |
| 1975 | 99.00 | 1994 | 1,623.42 |
| 1976 | 0.00 | 1995 | 1,391.83 |
| 1977 | 165.80 | 1996 | 1,558.97 |
| 1978 | 877.16 | 1997 | 192.38 |
| 1979 | 105.51 | 1998 | 3,275.19 |
| 1980 | 237.93 | 1999 | 3,056.01 |
| 1981 | 0.00 | 2000 | 4,744.63 |
| 1982 | 0.00 | 2001 | 5,826.48 |
| 1983 | 89.25 | 2002 | 8,669.60 |
| 1984 | 865.11 | 2003 | 3,227.16 |
| 1985 | 1,642.69 | 2004 | 6,105.85 |
| 1986 | 7,393.38 | 2005 | 2,907.35 |
| 1987 | 9,710.50 | 2006 | 4,101.18 |
| 1988 | 917.64 | 2007 | 1,670.40 |

Case 2:14-cv-04072-REL   Document 27   Filed 06/30/15   Page 4 of 55

| 1989 | 917.64 | 2008 | 4,282.12 |
|------|--------|------|----------|
| 1990 | 693.44 | 2009 | 0.00 |
| 1991 | 721.49 | 2010 | 0.00 |
| 1992 | 255.51 | 2011 | 0.00 |
|      |        | 2012 | 0.00 |

(Tr. at 216, 245-246).

**Function Report**

On June 23, 2011, plaintiff completed a Function Report (Tr. at 273-280). Plaintiff does not cook because she cannot stand too long due to pain in her legs, feet and back. She does no household chores and no yard work. When she goes out, she can ride in a car or use public transportation. She needs someone to go with her when she goes out because her legs get week and hurt. She does not go shopping. She reads and watches television. She does "a lot of communication" every day on the phone and on the internet. Her impairments do not affect her ability to remember, complete tasks, concentrate, understand, follow directions or get along with others. She can lift 15 to 20 pounds; she can walk 1 1/2 to 2 blocks. She can pay attention "most of the time." She is able to finish what she starts. She gets along with authority figures "very well." She does not deal with stress well because she is hurting constantly every day. She "could use" a wheelchair on days when she cannot get on her feet.

Plaintiff stated that her back pain causes her blood pressure to be elevated, it causes her stomach to be "off track," and she feels like she is in prison because all she does is sit in her house due to her back pain.

**Function Report - Third Party**

On June 23, 2011, plaintiff's husband, Walter Lewis, completed a Function Report (Tr. at 264-271). Mr. Lewis stated that he does everything for plaintiff. He cleans for her, cooks

5

for her, and sometimes has to dress her and give her medication. She cannot stand for a long time. Mr. Lewis does all of the household chores. When plaintiff goes out she is able to ride in a car and use public transportation. She cannot go out alone because she cannot walk by herself when she is in pain. Plaintiff does not drive. She does not go to the store because Mr. Lewis does all the shopping. Plaintiff's hobbies include watching television, playing TV games and playing card games. She sits outside when she feels up to it, and she goes to church when she feels up to it. Plaintiff has no problems getting along with family, friends, neighbors or others. Plaintiff's impairments do not affect her ability to understand, follow instructions, complete tasks, get along with others, concentrate or remember. She can lift 20 pounds; she can walk three blocks before needing to rest for 15 minutes. She cannot bend, squat or reach overhead. She starts what she finishes, she follows written and spoken instructions very well, she gets along with authority figures. She does not deal well with stress caused by her pain. Plaintiff sometimes uses a wheelchair. Mr. Lewis has not been able to work for the past two years because he has had to stay with plaintiff -- he never knows what kind of day she is going to have.

**Disability Report - Appeal**

On September 18, 2011, plaintiff completed a Disability Report - Appeal (Tr. at 285-291). "[T]his is stressing me out taking all of these pills an[d] being told there is nothing wrong with me. That I can work with the meds I take."

> I have been dealing with this pain in my back since 2003. I never thought I had back problems I just didn't know what was going on. My blood pressure was high for over a year due to back problems. I'm talking about 202/163 that's to[o] high for anyone. Then I had stomach problem colon problem it's too much it keep[s] me stress[ed] out taking all these pills and then to be told you can go to work your [sic] not sick enough how sick do I need to be. I haven't work[ed] a job in the last 2 yrs. due to my back. I try to work I can't do it, it's to[o] painful for my body & need surgery. And I can't make the surgeon do it either. So what am I to do. . . . My body is in pain at all time[s] even when I'm sleeping that why I take meds. I'm talking about my legs, back, arms, private, feet, even my hands an[d] neck. How much pain do I have to endure to get help? I

have been through E.R. an[d] have had shots with so much meds in them an[d] still be hurting.  My question is what should I do?

## Statement of Claimant

In a statement dated August 27, 2012, plaintiff reported that she has chest pains but was tested and learned that her heart is fine but the pain in her neck and back is giving her chest pain (Tr. at 301-304).

The pain makes me evil, not easy to get along with.  That is how it is right now, I'm not that type of person. The pain is - I don't know - I will be in pain and a conversation will just irritate me.  I can't be around a lot of talking.  The pain ... and I've been having real bad headaches.  I stay irritated and agitated all the time.  I stay away, I don't have people coming over.  It feels like I'm in prison.  I want to be around people and not be complaining about pain.

My sister was over recently and I took my pain medicine.  I haven't been sleeping.  It worked faster than it usually does and it made me so sleepy that I couldn't even get up to see my sister.  It made me feel like I couldn't get up because of the medicine. I didn't get back up that night. That scared me. I took what I was supposed to take. That is the medicine for my pain.

I don't know if it is my stress but I'm having stuff that scares me, my blood pressure is too high and my back is having trouble and that scares me and I'm up all night.  My doctor said that my back looks like a 70 or 80 year old woman's back and I'm 52. That scares me.  I'm delirious and I'm tired.  I'm forgetting things right in the middle of conversations, right in the middle of doing things.  I don't know if it is because I'm tired or because I'm anxious or stressed.  I've been depressed. Some days I feel crazy and I don't know why I'm feeling like this.  It is stressful to go through something like this.  I want to get rid of this pain.  It is bothering me in other areas in my body and my mind. I have endured so much pain and have suffered so much pain.  I was hoping and praying that I can have surgery because I feel like I need it right now the way my body feels, if they can lift the nerve off of the disk, I think I will feel better.  I'm scared.

## B.    SUMMARY OF MEDICAL RECORDS

On February 22, 2005, plaintiff had an MRI of her lumbar spine (Tr. at 646-647).  The results showed central to right paracentral disk protrusion at the L5-S1 level with associated disk degeneration, but otherwise normal study.  Levoscoliosis (abnormal curvature) was present in the lumbar spine.  Degenerative changes were present in the facets at L4-5 and L5-

7

S1 as well as degenerative changes in the disk space at L5-S1. Vertebral body heights were maintained and no spondylolysis or spondylolisthesis[1] was seen.

On September 23, 2005, plaintiff went to the emergency room after being struck on her forehead and hip by a stick during an altercation with her boyfriend (Tr. at 654-658). Plaintiff had consumed "considerable gin" just prior to the assault. X-rays showed a fracture of the anterior iliac spine at the anterolateral aspect of the left side of the pelvis, but no hip fracture. Plaintiff was told to use crutches and was given an prescription for Lortab, a narcotic.

On April 12, 2008, plaintiff went to the emergency room due to chronic back pain (Tr. at 663-664). She said she had just been rejected for Social Security disability and moved to Columbia from Kansas City, and she had just started a job in housekeeping. Plaintiff did not yet have a primary care physician. She was given a prescription for Percocet (narcotic).

On August 26, 2008, plaintiff saw Andrew Quint, M.D., for back pain (Tr. at 493-494). Dr. Quint prescribed Oxycodone (narcotic) and gave her a handout on back strengthening and stretching exercises.

On November 1, 2008, plaintiff went to the emergency room complaining of chest pain and congestion (Tr. at 666-669). "Percocet not helping." Plaintiff's tests were normal. She was assessed with upper respiratory infection and chest wall pain and was given a prescription for Percocet (narcotic) and Phenergan (for nausea).

---

[1]"Spondylolysis is a specific defect in the connection between vertebrae, the bones that make up the spinal column. This defect can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis. Spondylolysis is a very common cause of low back pain." http://my.clevelandclinic.org/health/diseases_conditions/hic_your_back_and_neck/hic_Spo ndylolysis

On February 20, 2009, plaintiff went to the emergency room complaining of a headache (Tr. at 532). Plaintiff denied illicit drug use (Tr. at 536).

On March 12, 2009, plaintiff saw Hanna Gov-Ari, M.D., for hypertension (Tr. at 594-595). Her recent head CT was normal. Plaintiff had been prescribed Hydrochlorothiazide and Norvasc and her blood pressure today was 108/75 with resolution of her associated headache.

On April 13, 2009, plaintiff saw Dr. Gov-Ari for a follow up on depression (Tr. at 596-599). "I have prescribed the pt. with Zoloft [antidepressant] couple of months ago. Apparently pt. took only 2 pills and discontinued it since it made her nauseated." Plaintiff's blood pressure was 136/94. Plaintiff was observed to have normal gait, normal range of motion, normal strength, but lower back tenderness. She was cooperative with normal judgment. She was sad, depressed and crying. She said her husband was angry because he was working two jobs and plaintiff was not working, and he had talked about leaving her. Dr. Gov-Ari prescribed Vicodin (narcotic) for plaintiff's back pain and "consider PT [physical therapy] later on when pt feels mentally stronger." She also prescribed Effexor, an antidepressant.

On May 11, 2009, plaintiff saw Mary Williamson, Ph.D., at Family Medicine Clinic (Tr. at 603-604). Plaintiff said she thought her appointment was with her primary care physician. She denied drinking and illicit drug use. She was smoking a pack of cigarettes per day. Dr. Williamson spent an hour in counseling with plaintiff.

On May 12, 2009, plaintiff saw Dr. Gov-Ari for a follow up (Tr. at 606-608). Plaintiff said she was feeling better since her psychiatrist increased her dose of Effexor. Plaintiff described a very stressful situation at home, had been told she could not stay in the rented house and had to find a new place to live. Plaintiff reported that taking one Vicodin a day was controlling her back pain, and Dr. Gov-Ari refilled that prescription. Plaintiff's blood pressure

was 128/91. She was observed to be cooperative with appropriate mood and affect and normal judgment. "Had seen Mary Williamson, Ph.D., for counseling and thought it was very helpful as well. Is supposed to see her back in a couple of weeks."

Plaintiff did not keep her follow-up appointment with Mary Williamson, Ph.D., on May 26, 2009 (Tr. at 604). "Will send DNKA [did not keep appointment] letter, but will not call as has had multiple missed appointments even with reminders."

On July 4, 2009, plaintiff saw Dr. Gov-Ari who noted that plaintiff's depression symptoms were better controlled on Effexor and that her blood pressure was well controlled on her current medication (Tr. at 609-611). Plaintiff's blood pressure was 120/86.

On August 6, 2009, plaintiff went to the emergency room complaining of a headache (Tr. at 537-538). She denied alcohol use, tobacco use, and drug use (Tr. at 538). Her head CT was normal (Tr. at 502-503).

On August 26, 2009, plaintiff saw Dr. Gov-Ari complaining of constipation (Tr. at 612-614). Dr. Gov-Ari attributed plaintiff's symptoms in part to her chronic use of narcotic medication. "Pt is also due a colonoscopy secondary to polyps on previous colonoscopy, strong family history of colon cancer and recurrent episodes of rectal bleeding. The colonoscopy was ordered several times but patient didn't keep appointments." Plaintiff continued to smoke a pack of cigarettes per day. Her blood pressure was 118/85. She had normal range of motion, normal strength, no tenderness and normal gait. Dr. Gov-Ari refilled plaintiff's Vicodin and told her to try to avoid it due to the side effect of constipation.

On September 14, 2009, Dr. Gov-Ari noted that plaintiff's hypertension was well controlled on medication (Tr. at 615-617). Dr. Gov-Ari recounted her previous instructions to plaintiff regarding treating her constipation. "I am not sure Sharon is following all those

instructions." Plaintiff had decreased her Vicodin to one pill per day. That prescription was refilled.

On October 12, 2009, plaintiff saw Dr. Gov-Ari who observed normal range of motion, normal strength, normal gait (Tr. at 619-620). Plaintiff's blood pressure was well controlled on medication. Plaintiff's Vicodin was refilled.

On November 13, 2009, plaintiff saw Dr. Gov-Ari (Tr. at 621-623). Plaintiff reported being very stressed at home, living in a small house with several family members. She was having difficulty with her husband. Plaintiff was observed to have normal range of motion, normal strength, normal gait, appropriate mood and affect, normal judgment. Plaintiff had not kept her appointments with her counselor but wanted another referral. Plaintiff's Vicodin was refilled.

On December 11, 2009, plaintiff went to the emergency room complaining of pain which she rated as an 11/10 (Tr. at 519). Her blood pressure was 137/108. Plaintiff said she had not been taking her blood pressure medications and could not remember the last time she had. She was given blood pressure medications and became medically stable (Tr. at 543). Plaintiff reported being very stressed after having been denied Social Security disability benefits twice and having to rely on her husband and family members for money and rides (Tr. at 523, 526). She stated that she felt like she did not want to wake up to this life anymore but denied wanting to commit suicide. Plaintiff had stopped taking her antidepressant medications and had been much more anxious and distressed since then. Plaintiff denied being a smoker (Tr. at 524, 527). She denied drug use (Tr. at 541). Plaintiff's cognition and memory were normal, her insight and judgment were fair (Tr. at 528). "Educated patient that abruptly discontinuing Effexor [antidepressant] was very likely to be causing a discontinuation syndrome that was

11

exacerbating the patient's affective disturbance. Recommend she not resume Effexor. Start Paxil [antidepressant]."

On December 14, 2009, plaintiff saw Dr. Gov-Ari (Tr. at 624-625). She said she had gone to the emergency room three days earlier for depressive symptoms. Plaintiff had discontinued Effexor as instructed in the hospital but had not started taking Paxil. Dr. Gov-Ari was concerned about plaintiff's chronic constipation: "Discussed with the patient the fact that bowel incontinence is very worrisome and is an emergency. Recommended sending to MRI today but patient refused." Dr. Gov-Ari refilled plaintiff's Vicodin and "discussed importance of starting the Paxil today to prevent further withdrawal symptoms of discontinuing the Effexor abruptly." Plaintiff had the MRI the following day, and that test did not show significant change from the last one done in May 2009. "No significant sacral pressure which can explain stress bowel incontinence."

On December 28, 2009, plaintiff was seen by Tania Amin, M.D., a psychiatrist (Tr. at 574-576). Plaintiff had stopped taking her Klonopin (for anxiety) and was told that stopping this drug abruptly can cause seizures. Plaintiff also saw Amanda Swenson, M.D., complaining of abdominal pain and diarrhea (Tr. at 627-628). Plaintiff had stopped taking all of her medications two days earlier. She was observed to have appropriate mood and affect and she was cooperative. She was assessed with viral gastroenteritis (stomach flu).

On January 15, 2010, plaintiff saw Theodore Choma, M.D., an orthopaedic surgeon (Tr. at 567-570). She reported having smoked a pack of cigarettes per day for 20 years and said other people in her house smoke as well. "She denies any alcohol or illegal drug use." Plaintiff reported her back pain as a 10/10. Her blood pressure was 113/78. Straight leg raising was negative. X-rays and an MRI showed evidence of disk desiccation (dehydration of the disk) at L5-S1. "The rest of her disks appear to be well hydrated within the lumbar region

12

with no evidence of posterior stenosis [narrowing of the spinal canal]." She had a broad based disk bulge[2] at L5-S1. "The importance of quitting smoking was discussed with the patient at length and also the importance of staying active and participating in her physical therapy program. The patient notes that she has recently scheduled herself to go back to school, and any activities such as this which keep her interactive with society and not lying around her house will be good for her back."

On January 19, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 630-632). Her hypertension was noted to be well controlled on medication. She was taking Paxil, Effexor and Clonazepam with "better control" of her psychiatric symptoms. She was eating prunes daily which was helping with her constipation. Plaintiff reported moderate back pain and no depression. Her blood pressure was 119/86. Dr. Gov-Ari refilled plaintiff's Vicodin.

On February 21, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 633-635). Plaintiff said she had stopped smoking a week ago and planned to exercise daily. "She understands the need to stay active. . . . She is going to apply for disability as she is not able to work having this pain." Dr. Gov-Ari refilled plaintiff's Vicodin.

On March 11, 2010, plaintiff saw Tania Amin, M.D., a psychiatrist (Tr. at 577-580). Plaintiff complained of constant back pain at a 9/10 in severity despite using Vicodin (narcotic) all the time. She said Dr. Choma did not want to do surgery on her back because she might be paralyzed forever. She was supposed to participate in physical therapy but she

---

[2]"Disks act as cushions between the vertebrae in your spine. They're composed of an outer layer of tough cartilage that surrounds softer cartilage in the center. It may help to think of them as miniature jelly doughnuts, exactly the right size to fit between your vertebrae. A bulging disk extends outside the space it should normally occupy. The bulge typically affects a large portion of the disk, so it may look a little like a hamburger that's too big for its bun. The part of the disk that's bulging is typically the tough outer layer of cartilage. Bulging usually is considered part of the normal aging process of the disk."
http://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428

said she waited five months and no one ever faxed in the orders. Plaintiff denied using street drugs and said she stopped smoking two weeks earlier (Tr. at 579). She was assessed with major depressive disorder, moderate to severe type. Dr. Amin increased plaintiff's Effexor because it can help a little bit with pain but it can also increase blood pressure so plaintiff was told to monitor her blood pressure. Plaintiff's Klonopin (for anxiety) was increased and she was told not to drink and not to stop taking this medication abruptly. Dr. Amin recommended plaintiff talk to her doctor about using a pain patch.

On March 26, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 636-638). Plaintiff said she was "doing much better today and says it is a good day today, is very determined in taking care of her pain as feels it is caused secondary to mood changes, irritability and anger." Plaintiff was smoking a pack of cigarettes per day. Dr. Gov-Ari prescribed Percocet (narcotic) and gave plaintiff a handout with home exercises.

On April 27, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 639-641). Plaintiff was upset because the Percocet was not helping her pain. She had separated from her husband, had no place to live, and was depressed and felt no one was helping her. She did not know why her Medicaid had been cancelled. Dr. Gov-Ari prescribed Oxycontin and Oxycodone (both narcotics) and contacted a social worker to help plaintiff with shelter. She provided a number to Medicaid so plaintiff could call to find out why her Medicaid card had been cut off.

On May 4, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 376-378). Plaintiff had been prescribed Oxycontin extended release, 10 mg twice a day, but she had started taking three pills twice a day and felt that dose was better at controlling her pain along with the Oxycodone for breakthrough pain. Dr. Gov-Ari prescribed the higher dose of Oxycontin but "was very clear with Sharon that she shouldn't take more than 1 tab a day as this time as it is a higher dose and taking 2 of them can cause decrease in the drive of breathing. . . . As for her

14

depression . . . we have discussed the fact that once she has more control of her life (by getting approved for housing and maybe finding a job) - she will feel better with herself. Sharon seemed to be agreeable and felt that was the right way to go." Plaintiff agreed to call the social worker to get some help.

On June 17, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 373-375). "I also had a long conversation with the patient regarding expectations and attitude. . . . I spoke with her about ways to talk to our personnel and that it was unacceptable to shout and use bad language. At a certain point, patient admitted to being very stressed at home from financial situation and her ongoing challenging relationship with her spouse. She is back to living with him since she doesn't have other options. We spoke before about a shelter but at this point, patient prefers to stay with her husband." Plaintiff's blood pressure was 143/102. She was cooperative with normal mood and affect, normal judgment. Her Oxycontin and Oxycodone were refilled and Dr. Gov-Ari sent plaintiff to see a social worker to help get her Medicaid card reactivated.

On July 6, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 369-370). Plaintiff's hypertension had been well controlled on medication but she had run out and her blood pressure was running high. Plaintiff's narcotic medications were refilled. She was encouraged to do home exercises.

On August 9, 2010, an ambulance was dispatched to plaintiff's residence after a 911 call was received indicating that plaintiff had fallen (Tr. at 671). "Medic 111 arrived on the scene . . . to find the patient bent over on the living room floor, complaining of severe left flank and back pain. Patient denies a fall. Patient had cleaned the house and had just had a bath when the pain occurred without a fall or trauma. Patient has had this type of pain before due to her back condition." Plaintiff appeared to be in a great deal of discomfort. Plaintiff was taken down three flights of stairs to the ambulance and transported to the hospital.

15

On August 16, 2010, plaintiff saw Dr. Choma (Tr. at 421-424).  Plaintiff's blood pressure was 177/106, her gait was normal.  X-rays were taken and an MRI was reviewed.  Plaintiff had marked loss of disk height at L5-S1 and although she had no significant focal stenosis, she did have an "an element of congenital stenosis."  Dr. Choma discussed surgery with plaintiff and she felt she had exhausted all other nonoperative options and was willing to proceed with surgery.  "I have asked her to stop smoking in order to prepare her body optimally for surgical fusion. . . .  She is to call me once she has been smoke-free for 2 weeks" and the surgery would then be scheduled.

On August 26, 2010, plaintiff saw Sonny Bal, M.D., an orthopaedic surgeon, for a second opinion on back surgery (Tr. at 414-415).  Dr. Bal went over all of her studies.  "I confidently told her that Dr. Choma is the best person equipped to address her problems surgically exactly as he described it in his record and that I would have all the trust in the world."

On September 17, 2010, plaintiff saw Diane Mueller, a nurse practitioner (Tr. at 390-398).  Plaintiff denied having ever used any drugs not prescribed to her (Tr. at 393).  She was asked if she had "**<u>EVER</u>**" had any of a number of symptoms, and plaintiff did not check vision changes, dizziness, psychiatric problems, anxiety, or panic disorder (Tr. at 393).  "She states she continues to smoke.  However, she has cut down and is trying to quit.  Her nicotine level from her admission work-up was significantly elevated, indicating continued smoking."  Plaintiff had been cleared by internal medicine to proceed with surgery and she was encouraged to be compliant with her hypertension medication and to stop smoking completely.

On September 20, 2010, plaintiff saw Dr. Gov-Ari (Tr. at 361-363).  Plaintiff reported having quit smoking five days earlier.  Dr. Gov-Ari refilled plaintiff's narcotic pain medication.

On September 28, 2010, plaintiff saw Diane Mueller, a nurse practitioner, for a pre-op visit (Tr. at 388-389). "She tells me she has resumed smoking. However, she feels better about her blood pressure being under good control." Plaintiff's pre-op physical was not performed and her October 14 surgery was cancelled.

On November 29, 2010, plaintiff aw Dr. Gov-Ari (Tr. at 352-354). Plaintiff indicated she lived on the 3rd floor with no elevator and was having difficulty climbing up the stairs daily. Her blood pressure was 154/90. "Patient used to have a case worker through Burrell Mental Health. Currently doesn't have one. Highly recommended to contact them as she found it very helpful (patient wants to reapply for disability and case worker helped her making phone calls, writing letters and showing up to appointments)." Plaintiff was told to continue her current medications.

On January 5, 2011, plaintiff saw Laurel Sommer, M.D., for high blood pressure (Tr. at 346-348). Plaintiff lived alone in a third story apartment and had begun having chest pains for the past six months when climbing the stairs to her apartment.

January 21, 2011, is plaintiff's alleged onset date.

On January 21, 2011, plaintiff aw Dr. Gov-Ari for a follow up (Tr. at 343-345). "Seen by ortho and discussed surgery which was postponed mainly since patient didn't quit smoking. Also significant social issues (lived in the 4th floor, no elevator - is about to relocate next week, financial difficulties." Plaintiff complained of neck pain, chest pain and left arm pain with no shortness of breath. Plaintiff "claims she hasn't been smoking for couple of weeks now." Dr. Gov-Ari refilled her narcotic pain medications. Because her blood pressure was high at 176/104, Dr. Gov-Ari increased her blood pressure medication. She recommended ice/heating pads, ibuprofen, and neck exercises.

Case 2:14-cv-04072-REL   Document 27   Filed 06/30/15   Page 17 of 55

On January 31, 2011, plaintiff saw Dr. Gov-Ari (Tr. at 337-342). Plaintiff said she had moved to a new apartment recently and had misplaced her narcotic pain medications. Plaintiff complained of neck pain causing chest and arm pain. Dr. Gov-Ari stated her belief that plaintiff's chest and arm pain was radicular pain from the cervical spine, but she reordered a stress test to be certain. X-rays of plaintiff's neck done after her appointment showed mild narrowing change in C6-C7 and moderate narrowing of the interspace in C5-C6. "Will communicate to patient and offer physical therapy."

On February 22, 2011, plaintiff saw Dr. Gov-Ari (Tr. at 334-336). Plaintiff's blood pressure was elevated, "might be because of pain as lost her pain meds and hasn't been taking them for couple of weeks now." Her blood pressure was 176/90. Plaintiff said she had not been able to do the neck exercises. Plaintiff "has been smoking recently - because of stress." Plaintiff's narcotic pain medications were refilled and she was told to do neck exercises at home.

On March 22, 2011, plaintiff saw Dr. Gov-Ari for medication refills (Tr. at 331-333). Plaintiff's Oxycontin and Oxycodone were refilled and an MRI of the cervical spine was ordered due to plaintiff's complaints of neck pain.

On April 22, 2011, plaintiff saw Dr. Gov-Ari for medication refills (Tr. at 327-330). "Getting monthly pain medications, Oxycontin and Oxycodone. . . . BP at target today. Neck pain with radicular symptoms - Did some exercise with no significant improvement of pain. Is taking Ibuprofen as needed which doesn't seem to help. Still describes neck pain radiating to her left arm with some numbness and tingling. Chest pain which was attributed to her neck problem. Was scheduled in the past with a stress test which was not done. Is interested in reordering it." Plaintiff had resumed smoking. Dr. Gov-Ari refilled plaintiff's Oxycontin and Oxycodone prescriptions. A treadmill stress test was scheduled for April 26. On April 25,

18

plaintiff called "stating that she just can't do the treadmill tomorrow as she can hardly walk because she hurts so much." Plaintiff said she wanted an MRI/back injection as soon as possible. Two days later, the following was added to this medical record: "Does not look like anything has been scheduled for the spine center for an injection, patient had an appointment back on 3/2 with Dr. Choma and was a no show."

On May 3, 2011, plaintiff went to the emergency room complaining of "pain all over" (Tr. at 320-326). Plaintiff was living on the third story of an apartment building. Chest x-rays were normal. Plaintiff was given IV morphine (narcotic) with some improvement. Plaintiff had not taken her blood pressure medication and the ER doctor attempted to give her IV hypertension medication and/or admit her to bring her blood pressure down but plaintiff "wanted to leave."

On May 5, 2011, plaintiff had an MRI of her cervical spine due to complaints of neck pain (Tr. at 318-319). The MRI showed degenerative changes.

On May 24, 2011, plaintiff saw Dr. Gov-Ari for medication refills (Tr. at 314-317). Dr. Gov-Ari noted that plaintiff had a long history of severe lower back pain with known disc degeneration in L5-S1. "Seen by Dr. Choma who offered surgery which was cancelled as pt. was not able to quit smoking. Her BP was also elevated at the time." Plaintiff complained of left-sided chest pain in addition to neck and back pain. "Back to smoking and is very frustrated about it." Plaintiff's blood pressure was 156/96. She had tenderness over her cervical spine with restriction on moving the neck mainly to the left. Plaintiff's Oxycontin (narcotic) was refilled with 60 pills and her Oxycodone (narcotic) was refilled with 120 pills. "Pt. is planning to quit smoking as she knows she will not be able to have any surgery without doing so." Plaintiff reported that her blood pressure is "usually well controlled on current regimen. BP elevated today possibly due to pain."

On June 4, 2011, plaintiff went to the emergency room complaining of back pain (Tr. at 383, 676-678). She said it was a recurrent problem caused by degenerative disc disease and that she needs surgery. Plaintiff said she had an upcoming appointment with a surgeon. She was listed as a smoker. She had decreased range of motion and muscle spasms in her back. X-rays showed L5-S1 disk space narrowing with mild multilevel degenerative changes. She was given IV Dilaudid (narcotic) and Valium (for anxiety).

On June 8, 2011, plaintiff went to the emergency room complaining of back pain (Tr. at 673-674). Her mood and affect were normal. Her extremities were non-tender with full range of motion. She was given Dilaudid (narcotic) and Valium.

On June 15, 2011, plaintiff saw Dr. Choma (Tr. at 385-387, 449-451). He noted that plaintiff had recently experienced left shoulder, chest and arm pain resulting in an MRI of her cervical spine showing spondylosis. "However, the patient tells me that in the intervening weeks her left chest and arm symptoms have abated. She continues to be bothered primarily by her low back pain and she is very clear about this. . . . She is very vocal about her desire to quit smoking but she is a little equivocal about whether she has actually quit right now." Dr. Choma reviewed plaintiff's lumbar spine x-rays from two days earlier. On exam Dr. Choma found that plaintiff's condition was not significantly different from previous exams. "This is a patient whom again I have offered L5-S1 anterior lumbar interbody fusion with an attempt to address her disk degeneration and subtle degenerative retrolisthesis.[3] However, again I have stressed that she needs to be smoke free before scheduling such surgery. I also stressed that she needs to cut down on her narcotic usage preoperatively to prepare her body for surgery."

_____

[3]A retrolisthesis is a posterior displacement of one vertebral body with respect to the adjacent vertebrae to a degree less than a luxation (dislocation).

On June 21, 2011, plaintiff saw Dr. Gov-Ari (Tr. at 446-448). "Today the patient is very combative and verbally abusive. She tells me that it is a lie that her neck pain is better. She says that she has been coming to this office for 2 years now but nothing has been done for her pain. . . . She said she had quit smoking a week ago but planned to give herself a month before going back to see [Dr. Choma]. When I told her that Dr. Choma is expecting her to reduce the dose of her narcotics as a preparation of her body to surgery she was very loud saying she is not willing to do that and no one will take her off the pain medication. . . . Patient will be fired from the Family Medicine clinic today, mainly because of today's behavior and many other past incidents (please refer to today's phone message, 6/6 phone messages and several other messages throughout the chart) which are well documented in the chart. Gave the patient 1 month supply of her pain medications: Oxycontin 30 mg BID [twice a day], #60 and Oxycodone 5 mg QID [four times a day], #120. No refills."

On July 7, 2011, plaintiff saw Richard Bowers, D.O., a psychiatrist, complaining of being "stressed out" (Tr. at 431-436). Plaintiff had been terminated by her primary care physician. She said had spine surgery scheduled for July 15. She was stressed because she was living with other people, she was in pain, and she was having problems with fiances. Plaintiff reported having quit smoking two weeks earlier. She admitted a history of cocaine use. Plaintiff's mental status exam was normal except that her mood was sad. She was assessed with dysthymia, a mild but long-term form of depression. Dr. Bowers prescribed Celexa, an antidepressant.

On July 21, 2011, plaintiff saw Julia Halsey, M.D. (a resident supervised by Robert Hodge, Jr., M.D.), to establish care "after being fired from Family Medicine for being verbally abusive and non-compliant" (Tr. at 442-445). Plaintiff indicated that she had not smoked in the past few weeks and was ready to schedule surgery with Dr. Choma. Plaintiff denied drug

21

use. Her blood pressure was 128/80. Her gait was unsteady and she had 4/5 strength in her extremities secondary to pain. Dr. Halsey refilled plaintiff's Oxycodone and Oxycontin.

On August 4, 2011, plaintiff was seen by Richard Bowers, D.O., a psychiatrist (Tr. at 680-682). Plaintiff said she had stopped smoking and was waiting on the back surgery. "The surgeon is out of town, and he should be back tomorrow." Plaintiff reported that Celexa was helping her mood. Plaintiff was appropriately dressed and groomed with normal motor activity. She was cooperative and had good eye contact. Flow of thought was goal-directed. Her mood was "kind of stressed." Her insight and judgment were intact. She said that her current stressors were living with her son and her finances. Dr. Bowers assessed dysthymia.

On August 22, 2011, plaintiff saw Dr. Halsey (Tr. at 683-686). Plaintiff said she had only smoked five cigarettes in the past month and believed she was ready for the back surgery. Plaintiff was taking 30 mg of Oxycontin twice a day and 5 mg of Oxycodone every six hours. Plaintiff reported an improvement in her mood after having been prescribed Celexa by Dr. Bowers. Plaintiff denied chest pain and visual problems. She described her back pain as severe with muscle weakness and gait disturbance. Plaintiff denied alcohol use and drug use. She was observed to walk hunched over, taking small steps. Plaintiff was given refills of her narcotic pain medications.

On September 27, 2011, plaintiff saw Dr. Halsey for a follow up on her back pain (Tr. at 687-690). Dr. Choma "plans to do L5-S1 anterior lumbar interbody fusion once she stops smoking. Patient reports getting down to only having smoked 5 cigarettes in the month preceding her last appointment. She is now back up to 6 cig/day." Plaintiff reported that the Celexa prescribed by Dr. Bowers was working well. Plaintiff had no visual problems, no chest pain. Despite taking 30 mg of Oxycontin twice a day and 5 mg of Oxycodone four times a day (both narcotics), she reported severe pain in her back, neck, joints, and muscles. Plaintiff

22

denied alcohol or drug use. On exam she had normal range of motion and strength in her musculoskeletal system but pain in her low back. She walked hunched over and took small steps. Dr. Halsey refilled plaintiff's narcotic medications. "Discussed that if she has not quit smoking by next month's visit we will decrease her short acting oxycodone to q8 from q6 [to every 8 hours from every 6 hours.]" The urine drug screen done this day tested positive for cocaine and marijuana "despite patient denying any illicit drug use. It was also negative for the oxycodone that she was being prescribed. A letter was sent to the patient informing her that we will be unable to prescribe her narcotics at any internal medicine clinic."

On December 4, 2011, plaintiff was seen in the emergency room at Boone Hospital Center for chronic back pain (Tr. at 694-696). Plaintiff said she had been scheduled for surgery but it was canceled last week and that she was off narcotics. She was having increasing pain. Plaintiff was listed as a smoker. Her mood and affect were normal. She was given IV Dilaudid (narcotic) and Ativan (for anxiety) and told to follow up with her regular doctor.

On January 9, 2012, plaintiff saw Dr. Bowers, her psychiatrist (Tr. at 691-693). This record reflects that once plaintiff was told by Dr. Halsey that no further narcotics would be prescribed for her, she cancelled all of her future appointments with Dr. Halsey. Plaintiff complained that the Celexa was not helping her as it once had, she was having problems with blood pressure, headaches, burning eyes, stress, appetite and sleep. "She denied any alcohol or drugs since I saw her last." Plaintiff's blood pressure was 147/107. She was appropriately dressed and groomed. "Behavior is slightly manipulative." Her insight and judgment were intact. Plaintiff was assessed with dysthymic disorder, mood disorder due to chronic pain, cannabis abuse unspecified, and cocaine abuse unspecified. Dr. Bowers prescribed Celexa, Wellbutrin (antidepressant) and Hydroxyzine (for sleep).

23

On January 15, 2012, plaintiff went to the emergency room at Boone Hospital Center complaining of back pain preventing her from being able to get out of bed (Tr. at 697-699). She was listed as a smoker. She was given IV Dilaudid (narcotic) and Ativan and a referral to Pain Management. Plaintiff saw Bradford Noble, D.O., in the Pain Management Clinic and was given an epidural steroid injection in her lower back (Tr. at 700-701).

On January 20, 2012, plaintiff saw Cory Bethmann, M.D. (Tr. at 765-767). Plaintiff reported taking her medication as prescribed and her blood pressure was "much better today." Plaintiff reported having to go to the emergency room because of her back pain and was given a shot of pain medication. She said she had been referred to pain management with Dr. Noble. "Has relationship with Dr. Choma and Univ, and now that she has stopped smoking, may be a surgical candidate, wants to wait and see pain management specialist first which I agree. She rates her pain as severe today." Plaintiff's blood pressure was 132/84.

On February 8, 2012, plaintiff saw Dr. Bethmann complaining of chest pain (Tr. at 768-770). Plaintiff said her pain had started a few weeks earlier around the time she had a steroid shot. Plaintiff's blood pressure was 190/100 and 188/102 during this visit and plaintiff reported a headache. "Does have history of cocaine positive on urine test thru University." Plaintiff was observed to have no unusual anxiety or evidence of depression. Her physical exam was normal. An EKG showed normal sinus rhythm, unchanged from a previous EKG in 2008. Plaintiff reported good compliance with her hypertension medication "but hasn't before." She was referred to the emergency room because of her high blood pressure and chest pain. In the emergency room, plaintiff reported a history of cocaine use but denied current use (Tr. at 703-720). She reported currently using no drug and having quit smoking two weeks earlier (Tr. at 719). Her drug screen was positive for marijuana and nicotine (Tr. at 713). Her blood pressure was 228/111 (Tr. at 719). Chest x-rays were normal (Tr. at 715).

24

Plaintiff was given morphine (narcotic) (Tr. at 717). A few hours after her arrival in the ER, plaintiff's blood pressure was down to 150/86 and her pain level was a 5/10 (Tr. at 720).

Plaintiff had an epidural steroid injection in her neck on February 9, 2012, given by Dr. Noble (Tr. at 746-748). "She was seen for lumbar epidural steroid injection on January 25, 2012. Her lower back is better at this point." She was discharged with no new prescriptions and with instructions to return to normal activities tomorrow but rest and refrain from driving or lifting today.

On February 15, 2012, plaintiff saw Dr. Bethmann for a follow up on hypertension (Tr. at 771-773). Plaintiff reported having a negative work up at the hospital. She said that she was taking all of her medications as prescribed and tolerating them well. She had been to pain management and had an epidural steroid injection "which helped her pain immensely, including pain in her chest she was having last week." Her chronic low back pain was listed as being under fair control. Her depression with anxiety was listed as being under fair control. Her blood pressure was 152/102. She was noted to exhibit no unusual anxiety or evidence of depression. Her hypertension was described as poorly controlled and her medication doses were increased.

In the early morning on February 21, 2012, plaintiff went to the emergency room complaining of chest pain (Tr. at 721-741). Her blood pressure was 154/111. She had a chemical stress test and an EKG. The test results were normal. Plaintiff had an ejection fraction[4] of 60%. Later that day she saw Dr. Noble who administered an epidural steroid

---

[4]"Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle. The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left

injection in plaintiff's lumbar spine (Tr. at 750-752). She was told to return to normal activities the next day.

On February 29, 2012, plaintiff saw Dr. Bethmann for a follow up on back pain (Tr. at 774-776). Plaintiff had had an epidural steroid injection in her lumbar spine the week before "which she reports only helped for about 2 days. She had a cervical [epidural steroid injection] done in the week before and has had excellent results." Plaintiff rated her pain as severe and she was tearful during the exam "as she is so tired of feeling this bad. She has previously seen Dr. Choma at Univ and was possibly going to have surgery on her back but has been dismissed from the Univ and cannot return there. She reports it was a misunderstanding related to her abusing her pain medications although she was able to stop them before the planned surgery and then she also had a positive drug test for cocaine which she denies." Plaintiff's hypertension was noted to be uncontrolled but she had no symptoms from her hypertension. The record reflects that plaintiff's depression was doing poorly "with her chronic pain being so severe currently." Plaintiff's blood pressure was 150/100. Dr. Bethmann called Dr. Noble, who administered the epidural steroid injection, and "he will try again today, we sent her right over there." Dr. Bethmann ordered an MRI of the lumbar spine.

Dr. Noble performed a caudal epidural steroid injection, ordered an MRI, and recommended she see Dr. Terry Ryan for a neurosurgical second opinion (Tr. at 754-756).

On March 1, 2012, plaintiff had an MRI of her lumbar spine (Tr. at 742-744). There was no central canal stenosis (narrowing) and no neural foraminal narrowing at the L1-2, L2-3, L3-4, and L4-5 levels. There was disk space narrowing with degenerative end plate changes

---

ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal." http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

26

and disk desiccation at L5-S1. The size of a disk protrusion at this level was decreased when compared to the prior examination on February 22, 2005.

On March 14, 2012, plaintiff saw Dr. Bethmann for a follow up on hypertension and back pain (Tr. at 777-779). Plaintiff's blood pressure was 145/105 but was noted to be asymptomatic. Plaintiff was observed to have no unusual anxiety or evidence of depression. Dr. Bethmann increased plaintiff's Metoprolol (for hypertension) from 50 mg to 100 mg per day and told her to continue with her other medications.

On March 22, 2012, plaintiff saw Dr. Noble (Tr. at 758-760). Plaintiff had "predominantly neck pain at this point. She underwent caudal epidural steroid injection on 02/29/2012,which really helped with her lower back pain. Again, she is having neck pain today and the decision was made to proceed with cervical epidural steroid injection. In addition, she feels as if the injections are generally only helping for a short period of time and wonders if we could start some pain medication. She signed a pain management clinic controlled substance agreement with our clinic today and point of service urine drug screen was undertaken, which was positive for cannabinoids. Evidently she is using marijuana to help with her nerves. I have counseled her that the continued presence of THC in her urine collected in future samples would be a violation of her pain management clinic controlled substance agreement. A prescription for Percocet [narcotic] . . . was written today." Plaintiff was given another epidural steroid injection in her neck.

On April 16, 2012, plaintiff saw Dr. Bethmann for a follow up on hypertension (Tr. at 780-782). The record reflects that plaintiff was taking Oxycontin (narcotic) for her back pain with fair control. Her depression/anxiety were noted to be under fair control. Plaintiff's blood pressure was 135/95. Plaintiff's physical exam was normal. She was observed to have no unusual anxiety or evidence of depression. Plaintiff's hypertension was noted to be "better

27

than it has been." Dr. Bethmann noted that plaintiff's back pain was under fair control. "[R]ecently started on oxycontin again, reports no significant improvement and side effects with it of nausea and cloudy thinking. Has seen Dr. Ryan as well and was smoking so no imminent plan for surgery but she is hopeful she will be able to quit long term and have it done."

On May 2, 2012, plaintiff had an initial evaluation at Burrell Behavioral Health (Tr. at 792-799). Plaintiff said she had been a client of Burrell Behavioral Health a year and a half earlier. "The client reported that she left BBH services because 'my caseworker said that I was abusing my grandchildren... I got investigated and the case was closed right away... I wasn't neglecting anybody.'" Plaintiff stated that she was struggling with making it to medical appointments due to transportation issues. She reported a history of panic attacks but could not recall the frequency of her panic attacks. She said she was worried about "my health... I'm living from place to place... I don't have enough money to take care of myself ... My basic needs." The interviewer recommended further testing to confirm plaintiff's diagnoses of generalized anxiety disorder and mood disorder not otherwise specified.

On May 16, 2012, plaintiff saw Dr. Bethmann for a condition unrelated to her disability claim (Tr. at 783-785). Plaintiff's blood pressure was 130/100 and was noted to be under fair control. Her depression/anxiety were stable. Her physical exam was normal and she was noted to have no unusual anxiety or evidence of depression. Plaintiff said she was transferring to Burrell for her mental health care, and Dr. Bethmann agreed to refill her psychiatric medications in the interim if necessary. Plaintiff reported a history of marijuana and cocaine use. She said that marijuana helps with her pain and said she gets irritable when she does not use marijuana. Plaintiff reported daily use of marijuana and said her last use was

about two weeks earlier. Plaintiff described daily use of cocaine and withdrawal symptoms when trying to quit, but she said her last time of using cocaine was about ten years earlier.

On June 22, 2012, plaintiff saw Dr. Bethmann complaining of back pain (Tr. at 786-788). Plaintiff reported that she had been referred for back surgery "but due to unstable living situation right now, is being postponed." Plaintiff had been under a lot of stress and described her life as "in crisis" due to arguments with her husband. Plaintiff's depression and anxiety were noted to be under poor control; however, she stated that she had not been taking her medications regularly. Her blood pressure was 168/100. Plaintiff was "crying but consolable." She had a depressed affect, was anxious and tearful. "Crying discussing current social situation, finances, etc." Dr. Bethmann wrote, "Will request most recent note from next door neurosurgery office to see if she is truly slated for surgery soon. Did complete housing form stating she is handicapped as a result of her back pain [illegible] she is disabled, this may help her get into housing sooner."

On July 11, 2012, plaintiff saw Dr. Noble (Tr. at 762-764). "I will go ahead and give Sharon 1 more opportunity to provide a clean urine drug screen today, and I will provide a prescription for Percocet 5/325 number 90, 1 p.o., t.i.d. p.r.n. pain [1 by mouth three times a day as needed for pain], maximum daily dose 3 with no refills. Sharon does describe having met with Dr. Terry Ryan for neurosurgical evaluation. The decision has been made to hold off for now based on her overall health." Dr. Noble performed a caudal epidural steroid injection in plaintiff's lower back.

On August 6, 2012, plaintiff saw Dr. Bethmann complaining of pain (Tr. at 789-791). Plaintiff was described as tearful, she said she had been to Pain Management but did not feel that she was getting significant benefit. She was unable to get steroid injections as often as she wanted them. "Surgery has been offered but due to lack of stable home environment it has

29

been postponed by her and the surgeons, also due to smoking it has been postponed." Plaintiff also reported jaw pain due to a broken tooth. Plaintiff was convinced she had a bone disorder in addition to a back disorder. Her blood pressure was 140/100. She was described as crying but consolable, agitated but not forgetful. Plaintiff's lab work was normal.

The following records were submitted to the Appeals Council.

On August 28, 2012, plaintiff saw Dr. Noble at the Pain Management Clinic of Boone Hospital Center (Tr. at 801-802, 915-916). Plaintiff reported pain in her lower back and left arm which she rated a 9/10. Plaintiff's urine tested positive for marijuana. "This I believe is the 3rd consecutive test which has been positive for cannabinoids. We are unfortunately no longer able to prescribe controlled substances for Sharon Lewis." Plaintiff denied chest pain but reported "some headache," double vision, sweating and nausea. Plaintiff was "ambulatory independently without assistive device." Plaintiff was described as being "in poor spirits." Dr. Noble prescribed physical therapy to develop a home exercise program for cervical and lumbar stabilization and strengthening. "Eventually we may have to consider neurosurgical second opinion in Sharon Lewis's case since she really has not responded well to interventional pain management techniques and her cannabinoid abuse has violated her controlled substance agreement on 3 separate occasions."

On September 10, 2012, plaintiff had a physical therapy evaluation with Robin Wilson (Tr. at 804-810). "She states that she is always in pain and hasn't been sleeping well for over 4 months. She states that she isn't eating well because she doesn't feel well, she is tired all the time and her blood pressure has been sky high. She is currently taking Percocet [narcotic] only when she absolutely needs them." Aggravating factors were noted to be sleeping in the same position for any length of time, trying to move after being still for any length of time, prolonged sitting or standing, and walking for any length of time. Relieving factors were

Percocet (narcotic), heat and ice. Plaintiff described her pain as a 7/10. She said that during the last week, her pain at its best was a 5/10 and her pain at its worst was a "10+/10 but doesn't have any way to get to the ER." Plaintiff was observed to be unable to stand fully upright and was bent forward from the waist due to pain. On exam plaintiff was found to have limited range of motion in her back and neck, although no measurements were provided. Strength was limited in her abdominal, back and cervical areas. She was unable to lie in a prone position due to pain. Every test administered was either positive or the test could not be done due to complaints of pain. "She is tender to touch almost everywhere on her body. She had improvement in her pelvic and sacral mobility following treatment today. . . . [S]uboccipital release and cervical distraction eliminated her headache. She would benefit from therapy at this time to work on increasing mobility throughout the pelvis and spine, decreasing pain and muscle spasm, increasing pain free AROM [active range of motion] and flexibility throughout the spine and hips and increasing strength and stability throughout the spine."

On September 12, 2012, plaintiff went to the emergency room complaining of a headache that had started three days earlier (Tr. at 817-818). Plaintiff reported smoking a half a pack of cigarettes per day. On exam her extremities were non-tender with normal range of motion and normal joints. She was observed to be fully oriented with normal mood and affect. She was given an injection of Dilaudid (narcotic).

On September 13, 2012, plaintiff had physical therapy (Tr. at 812). She described her pain as a 7/10 and reported that her headache returned an hour or two after her last treatment. "She states that she was pretty sore after therapy and spent most of the evening of the evaluation day in bed [lying] down due to pain. She states that she is still in a lot of pain but does feel the therapy interventions helped her to move a little better." Plaintiff was

observed to have entered the clinic with a much more erect posture. Plaintiff was told to continue her range of motion and strengthening exercises.

On September 17, 2012, plaintiff was seen for physical therapy (Tr. at 813-814). She described her current pain as a "10+/10." "She enters the clinic very tearful and painful. She states that if she had a car she would have had someone take her to the ER. She has not been able to have a bowel movement for several days, stating that she had tried yesterday thinking she had to go but she just didn't have the strength to push it out. . . . She states that she had to walk to PT today, approx. 3 miles, because she didn't have a ride." Plaintiff reported lying in bed with a heating pad trying to ease her pain. "She states the more she [lies] around, the stiffer she gets and the harder it is to get up and around but the more she moves around the more she hurts." Plaintiff's blood pressure was 168/108. The physical therapist attempted to contact Dr. Noble's office about plaintiff's high pain levels and other symptoms but was unable to reach the doctor. Plaintiff was taken to the emergency room via wheelchair at her request due to the pain in her neck and head, her elevated blood pressure, and her inability to have a bowel movement. No physical therapy treatment was provided, but plaintiff was told to continue her range of motion and strengthening exercises.

While in the emergency room, plaintiff had a CT of her head due to complaints of a headache for the past week (Tr. at 819). No acute findings were made; however, mild chronic small-vessel ischemic disease[5] was noted. Her blood pressure in the ER was 185/105 (Tr. at 823). Plaintiff reported smoking a half a pack of cigarettes per day but denied drug use (Tr. at 823). She was given two injections of Dilaudid (narcotic), anti-nausea medication, and blood

---

[5]A condition in which the small arteries become narrowed, sometimes caused by high blood pressure.

32

pressure medication (Tr. at 821, 824). Her blood pressure at the time of discharge was 146/67.

On September 24, 2012, plaintiff saw Dr. Noble in the Pain Management Clinic for a follow up (Tr. at 862-863, 917-918). Plaintiff reported liking physical therapy and said she believed it was really helping. "She estimates 60 to 70 percent pain relief" but still rated her pain a 7 to 8 out of 10. Plaintiff reported experiencing headaches, double vision, sweating, and nausea. On exam plaintiff was observed to be in good spirits, she was ambulatory independently without assistive device. No abnormalities were noted. Her urine drug screen was negative. Dr. Noble recommended that plaintiff continue participating in physical therapy and said it was "fine for her to transition to a home exercise program. At this point I would still tend not to endorse chronic narcotic pain management. The last Percocet prescription from our clinic was back in July of this year."

Plaintiff's administrative hearing was held on September 25, 2012.

On October 1, 2012, plaintiff participated in physical therapy (Tr. at 833-834). "She states that she is feeling better and therapy is really helping her but continues to rate her pain levels very high", a 7/10 on this day. Plaintiff was told to continue her home exercises.

On October 4, 2012, plaintiff participated in physical therapy (Tr. at 835-837). "She continues to state that she is feeling better and therapy is really helping her but still rates her pain levels very high", a 7/10 on this day. "When questioned further about this she stated that she always feels a lot better after therapy, but whenever she has to do any amount of activity her pain increases fairly quickly. She makes comment that she would like to 'just get rid of this disc that is causing me so much pain and trouble.'" Plaintiff was noted to be compliant with her home exercise program. Her range of motion was improving. She was told to continue her range of motion and strengthening exercises.

On October 8, 2012, plaintiff attended physical therapy (Tr. at 826-831, 838-839). Plaintiff said she feels better after therapy but when she does some activity her pain increases fairly quickly. Her upper back pain was "fairly good" at a 5-6/10 but her lower back and leg pain were rated a 7-8/10. "She reports that she walked to therapy today due to her husband not being able to bring her." Plaintiff had been seen for 8 sessions and cancelled her appointments twice. Her flexibility was noted to be improving; her range of motion was limited by pain but improving. Back, neck and abdominal strength were limited. "She continues with a forward flexed posture overall, but posture with walking continues to be much more erect entering the clinic." Plaintiff was able to tolerate mild traction without increased pain, she continued to be tender to the touch on most areas of her body but was able to tolerate more pressure before pain responses were noted, "she has experienced elimination of most of her headaches."

On October 9, 2012, plaintiff saw Dr. Bethmann for chronic back pain and hypertension (Tr. at 923-926). Dr. Bethmann noted that plaintiff had been to see Dr. Ryan and Dr. Noble but was no longer being prescribed narcotic pain medication because "she has on more than one occasion violated the illicit drug policy with marijuana." Plaintiff was participating in physical therapy which she said was improving her pain; however, she reported "extreme muscle tightness" in her back and neck. Dr. Bethmann noted that long-term use of non-steroidal anti-inflammatories was not an option due to plaintiff's hypertension. Tramadol (narcotic-like pain reliever) had been ineffective. Plaintiff had reported an inability to tolerate tricyclic antidepressants. As far as her hypertension, plaintiff reported that she had been to the emergency room about a month earlier with a severe headache and very high blood pressure. "She admits that she wasn't taking her blood pressure medications daily." She reported doing better with medication compliance since that ER visit

but reported continued headaches. She denied chest pain and shortness of breath, and she said her blood pressure was aggravated by stress and chronic pain. Dr. Bethmann noted that plaintiff's pain was being treated by Dr. Noble, her depression and anxiety were being treated by Dr. Bowers, and her lumbar degenerative disc disease was being treated by Dr. Ryan. Plaintiff's blood pressure on this day was 142/90. On exam her back muscles were tight and tender to palpation. Her memory was normal. She showed appropriate mood and affect. Her cardiovascular exam was normal. Dr. Bethmann prescribed Flexeril, a muscle relaxer, and told her to avoid controlled substances. He made no changes with her hypertension treatment.

On October 11, 2012, plaintiff participated in physical therapy (Tr. at 840-841). Plaintiff rated her pain a 9/10. "She states that she hurts all over today and feels generally bad. She states that she got a flu shot yesterday and feels like she is coming down with the flu. She states that she had a follow up with her primary doctor and he told her to just continue what she is doing for her back. He told her he did not have any kind of reports on her treatments, although this therapist sent him a report two days ago. She states that she did get a prescription for a muscle relaxer which she has only taken once." The physical therapist noted that plaintiff had significant reduction of pain with treatment. She described her pain as a 6/10 after treatment. She was told to continue her range of motion and strengthening exercises.

On October 16, 2012, plaintiff participated in physical therapy (Tr. at 842-843). She rated her pain a 7/10. Plaintiff reported that she still hurt all over and had not felt right since she got her flu shot. "She states that she had a headache yesterday and that is the first headache she has had in a while. Her headaches have been fewer and less intense since starting therapy." Her headache was resolved after physical therapy. She was told to continue her range of motion and strengthening exercises.

35

On October 18, 2012, plaintiff cancelled her physical therapy appointment because she had the flu (Tr. at 832).

On October 22, 2012, plaintiff participated in physical therapy (Tr. at 844-845). She rated her pain an 8/10. Her headaches were "minimal" but she still had a lot of discomfort in her lower back. Plaintiff's range of motion was improving, she had good improvement in her facet joint dysfunction through the spine with minimal dysfunction in the thoracic region. "Question whether patient really understands the pain scale because even on days she comes in stating that she feels pretty good and walking fairly erect she continues to have close to emergency room pain level ratings." She was told to "progress" her range of motion and strengthening exercises.

On October 25, 2012, plaintiff participated in physical therapy (Tr. at 846-847). Although plaintiff reported feeling "pretty good today," she rated her pain a 7/10. Her physical therapist noted that plaintiff's range of motion continued to improve and she tolerated all treatment well. Plaintiff continued to show "less pain gestures" with movement. She was told to progress her range of motion and strengthening activities.

On November 1, 2012, plaintiff participated in physical therapy (Tr. at 849-854, 856-857). Plaintiff rated her pain a 7/10. "She has been under a lot of stress this week, having gone to Kansas City to be with her daughter who had a miscarriage earlier in the week. She missed an appt earlier this week due to being out of town. She reports compliance with her HEP [home exercise program]. Pt is very weepy today, stating that she just wants to give up and quit taking all of her medications. She does not verbalize any suicidal ideations but is obviously very distraught over her daughter's miscarriage." The evaluation in this record copied all of the same historical information from plaintiff's first physical therapy visit, including listing Percocet (narcotic) as a current medication. Plaintiff had been seen for 13

36

sessions and had cancelled four sessions. All of the physical findings in this record are duplicates of the findings listed in her first physical therapy record. Plaintiff was able to tolerate traction in her neck with noted reduction in pain afterwards. "She may benefit from use of these at home." She continued to experience elimination of most of her headaches. Continuation of physical therapy was recommended.

On November 12, 2012, plaintiff participated in physical therapy (Tr. at 858-860). She rated her pain a 9/10. "She reports that she has been denied social security disability and is not very happy about it. She states that she knows that she can't go back to any type of house keeping job for 8 hrs a day with her back like it is. She states that she can't stand or lift and pull on things that long without severe pain. She states that her primary physician didn't even fill out the paperwork, maybe because she hasn't been going to him that long. She states that she 'can't even get any pain medication other than the flexeril [muscle relaxer].'" Plaintiff tolerated physical therapy well. "Pt continues with good improvement in her fact joint dysfunction throughout the spine. Her posture with standing and walking into the clinic today was more erect and she continues to show less pain gestures with other movements. However, she continues to rate almost emergency room pain levels without the pain postures that would normally accompany that type of pain." Plaintiff was told to continue her home exercise program.

On November 21, 2012, plaintiff did not show up for her physical therapy appointment or call to cancel (Tr. at 855).

On November 27, 2012, plaintiff saw Dr. Noble in the Pain Management Clinic for a follow up (Tr. at 865-866, 918-919). Plaintiff rated her neck pain a 7/10 and bilateral arm pain an 8/10. She denied chest pain and double vision but reported some headache. "She has been to physical therapy and I have encouraged her to continue with a home exercise

program." Plaintiff was noted to be in "somewhat poor spirits." Dr. Noble told plaintiff to return as needed.

On December 19, 2012, plaintiff saw Dr. Bethmann for "chronic conditions" and tooth pain (Tr. at 927-929). Under "chief complaint/reason for visit," Dr. Bethmann wrote that plaintiff asked him if he could write a note so that Burrell could get her some dental care. "Otherwise she is doing well, she may be starting voc rehab soon, again organized thru her case worker Sara Harding at Burrell. Still living with her son in town, her and her husband are trying to get section 8 housing right now, may have long wait to do so." The medical record states that plaintiff's hypertension was "well controlled" with "no symptoms." Plaintiff was taking her medications regularly. Her blood pressure was 122/84. Her depression/anxiety was listed as controlled with "no symptoms." Plaintiff was taking her medications regularly. Her list of medications did not include any pain medications or muscle relaxers. Her physical exam was normal except "poor dentition" with a fractured tooth. Her neck exam was normal, memory was normal, she had appropriate mood and affect, her cardiovascular exam was normal. "Plans to start voc rehab soon, may start NAAA as she is motivated and interested in stopping MJ [marijuana]."

On February 11, 2013, Dr. Bethmann completed a Residual Functional Capacity Assessment finding that plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for less than 2 hours, and sit for at least 2 hours but less than 6 hours. He found that she could occasionally climb, balance, stoop, kneel, crouch, crawl, squat, twist and bend. He found that she could reach, handle, finger, feel and grasp without limitation (but as to grip strength he wrote a question mark). He found that she should avoid concentrated exposure to temperature extremes, working near chemicals/fumes, vibration, heights and machinery.

38

*C.*    *SUMMARY OF TESTIMONY*

During the September 25, 2012, hearing, plaintiff testified; and Deborah Determan, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing plaintiff was 52 years of age and is currently 55 (Tr. at 41). She is 5' 4" tall and weighs 120 pounds (Tr. at 41). Plaintiff testified that in the past year she had weighed as much as 160 pounds and as little as 80 pounds (Tr. at 41). Plaintiff is married and had a 36-year-old daughter, a 32-year-old son, a 29-year-old daughter, and a 27-year-old son (Tr. at 42). Plaintiff was living with her son, her husband, her daughter and her two grandchildren (Tr. at 42-43). She lived in a house with stairs (Tr. at 43).

Plaintiff's caseworker from Burrell Behavioral Health drove her to the hearing (Tr. at 43). It took about 15 minutes to get there (Tr. at 43). Plaintiff was covered by Medicaid (Tr. at 44). Plaintiff's husband was unemployed at the time (Tr. at 44).

Plaintiff has an 11th grade education (Tr. at 44). She tried to get a GED but missed it by two points (Tr. at 44). She does not have a computer or an email address (Tr. at 44). She has never had a computer -- those are new to her (Tr. at 58). She has a cell phone provided by Burrell Behavioral Health (Tr. at 44).

Plaintiff cannot work because of her back pain and her high blood pressure (Tr. at 45). She used to work as a nurse caring for the elderly and she worked at a day care and in housekeeping (Tr. at 45). Her inability to lift, pull, and bend prevent her from performing those jobs anymore (Tr. at 45-46). Plaintiff last worked in July of 2008 or 2009 (Tr. at 47). She lost that job at Woodley's Cleaning Service because "they lost their contract" with the University of Missouri where plaintiff cleaned the library and arts and sciences building (Tr. at 47-48). She did that job for 5 1/2 to 6 months, and it was part time (Tr. at 48). Plaintiff

39

worked as a home health aide for 6 or 7 years in the 1990s and had to stop that job because she could no longer do it (Tr. at 48). She worked at a day care taking care of infants and toddlers but had to stop because of the lifting, pulling and bending (Tr. at 49-50).

Plaintiff was denied disability benefits in an earlier case, and she believes her condition has deteriorated since that time (Tr. at 46-47). Her blood pressure is "sky high" because of her back pain, her L5-S1 disc is "totally gone" with nerves "just floating around in there." Plaintiff is in constant pain, and walking around makes it worse (Tr. at 47). Steroid injections and pain medication are not helping (Tr. at 47).

Plaintiff has trouble combing her hair because lifting her arm is made painful by a disc in her neck (Tr. at 51). Plaintiff reads during the day, she watches television, goes to church when she can get a ride, and now that she has a caseworker she can go out a little more (Tr. at 52-53). When she attends Sunday school, she sits and pays attention for an hour (Tr. at 53). She goes to the grocery store once every three months just to get out, she does not buy anything (Tr. at 56). Mostly she stays in bed under the covers or in the bathtub (Tr. at 52). Plaintiff does not cook or do any housework, and she can only sometimes get dressed by herself (Tr. at 51, 54). She does not made her bed, do laundry, vacuum, or dust (Tr. at 56). Even though she can drive, she does not have a driver's license (Tr. at 57). She uses public transportation or family members will take her where she needs to go (Tr. at 58).

Plaintiff takes baths constantly in order to help with her pain (Tr. at 57). She used to smoke but quit about a month before the hearing[6] (Tr. at 58). When she did smoke, she smoked about a pack a day or less due to the cost (Tr. at 58-59). Her husband or family members would get her cigarettes for her (Tr. at 59). Plaintiff used alcohol "years ago" and

_____

[6]On September 17, 2012 -- eight days earlier -- she told an emergency room doctor that she was smoking a half a pack of cigarettes per day.

she was a drug addict years ago but said she no longer used those substances (Tr. at 59). She last used marijuana about a month before the hearing (Tr. at 60). She used marijuana about twice a month because it kept her off her pain medications (Tr. at 60). Her "so-called friends" would bring her marijuana (Tr. at 60). She has tried to cut those people loose because she does not want any addiction in her life (Tr. at 60). "I'm not even on pain medicine . . . right now because I'm going through a thing where I don't want that medicine. I don't want to be addicted to anything" (Tr. at 60). When asked about testing positive for cocaine, plaintiff said, "That's what they told me, but I didn't believe that, your honor, and I'm not going to argue that. It's what it is. If that's what they said it was, that's what it was. But I didn't believe that at the time." (Tr. at 60-61). When asked what street drugs she has used, plaintiff said she has used marijuana and cocaine (Tr. at 61). Plaintiff said she last used cocaine 25 years ago (Tr. at 61).

At the time of the hearing, plaintiff was on medication for hypertension, stomach acid, and insomnia/anxiety (Tr. at 61-62). She was taking no medication of any kind for pain (Tr. at 62). She used medication from May to July of 2012, but none since then (Tr. at 62). When she was prescribed medication for pain, she took her medication as prescribed (Tr. at 62). About 8 days before the hearing, plaintiff was in physical therapy and her blood pressure at the time was 165/105 (Tr. at 62). She was told to go to the emergency room; and when she got to the ER, her blood pressure was 232/134 (Tr. at 62, 72). When her blood pressure is high, she cannot see, she cannot walk, and she feels sick (Tr. at 63). She got new medication then, and this one makes her feel "light" (Tr. at 63). Plaintiff recently was tested due to losing weight and getting down to about 80 pounds (Tr. at 63-64). "[T]hey . . . started telling me to eat a little portion of this and a little portion of that because I couldn't eat; anything I ate it felt like it was coming back up, and they said it was all due to the back pressure in my back." (Tr.

41

at 64). She had a steroid injection in her back, but that made her blood pressure go up to 268 over "a hundred and something" (Tr. at 64).

Plaintiff had not seen a psychiatrist yet (Tr. at 64). She started counseling at Burrell's about three weeks before the hearing and had an appointment scheduled with the psychiatrist in the month following the hearing (Tr. at 64). Plaintiff has no side effects from her current medication (Tr. at 65). She had five or six steroid injections in her back in one month's time and her primary care doctor said that was too much (Tr. at 66). Plaintiff was asked whether she had had any surgery on her back, to which she responded, "Every time I got close to it my blood pressure -- " (Tr. at 66). Plaintiff was no longer seeing an orthopedist -- every time they were getting her prepped for surgery, her blood pressure would get so high that they would not do the surgery (Tr. at 67). Plaintiff was asked about her smoking preventing her from having surgery, and she said, "And that too. That's why I've quit the cigarettes, your honor." (Tr. at 68). Plaintiff got a second opinion, and that doctor also recommended surgery for her back (Tr. at 71). Plaintiff stopped smoking at times, but she would restart due to stress (Tr. at 71-72).

She was participating in physical therapy for her back and that was helping (Tr. at 66). Physical therapy consisted only of massages, not exercises (Tr. at 66-67). She received injections in the stem of her neck, in her lower back and up her tail bone (Tr. at 73). Those helped briefly, but when the medicine wore off the pain came back even worse (Tr. at 73). The medicine wore off after about three hours (Tr. at 73). Plaintiff's back pain affects her when she is walking, she can hardly function, it keeps her stressed out because she is constantly in pain, and it makes her moody (Tr. at 73). Plaintiff got no relief from the neck exercises that were suggested in January 2011 (Tr. at 39). That pain made her feel like she was having a heart attack because it caused chest pain that radiated into her arm and hand (Tr.

at 74).  Plaintiff has thought about suicide because she cannot take the pain anymore (Tr. at 75-76).  When it rains, every place that plaintiff has ever received a shot hurts (Tr. at 76).

Plaintiff cries every day (Tr. at 76).  The crying spells last "sometimes weeks. Sometimes months." (Tr. at 77).  Her pain makes her hard to get along with because she does not want to be around anyone while feeling like she does (Tr. at 78).

Plaintiff has problems with her memory (Tr. at 68-69).  Sometimes she has to sit down and think about what she was getting ready to do, and she has to write her appointments down or she will forget when they are (Tr. at 69).  Plaintiff has no problem paying attention or understanding instructions, and she gets along with others (Tr. at 69).  She can touch her knees (Tr. at 69).  She cannot climb any stairs (Tr. at 70).  She can barely lift a gallon of milk (Tr. at 70).  She can stand for 10 to 15 minutes at a time (Tr. at 70).

**2.      Vocational expert testimony.**

Vocational expert Deborah Determan testified at the request of the Administrative Law Judge.  Plaintiff's past relevant work includes daycare worker, semi-skilled with an SVP of 3, light exertional level; housekeeping, unskilled, light exertional level; home health aide, semi-skilled with an SVP of 3, medium exertional level as described by the DOT but light as described b y plaintiff (Tr. at 79-80).

The first hypothetical involved a person limited to light work who could only occasionally climb, balance, stoop, kneel, crouch, or crawl; can never have concentrated exposure to vibration; can understand, remember and carry out simple instruction; can make simple work-related decisions; can have only occasional changes in work processes and environment; cannot work around the general public; and can only have incidental, superficial work-related contact with co-workers (Tr. at 82).  The vocational expert testified that such a person could perform light level work with an SVP of 2 (Tr. at 83).  For example, the person

43

could work as a housekeeper but would not be able to do any of plaintiff's other past relevant work (Tr. at 82). The person could work as a photocopy machine operator, DOT 207.685-014, with 33,000 jobs in the country and 1,600 jobs in the four-state region (Nebraska, Iowa, Kansas and Missouri); inserting machine operator, DOT 208.685-026, with 8,200 in the country and 225 in the four-state region; or solderer, production, DOT 813.684-022, with 10,000 jobs in the country and 750 in the four-state region (Tr. at 82-83).

The second hypothetical was the same as the first except the person would be off task 20 to 25 percent of the time (Tr. at 83). Such a person could not work (Tr. at 83).

The third hypothetical involved a person who had unpredictable and unscheduled crying spells (Tr. at 83-84). If the crying spells required an additional unscheduled break during the day, then the person could not work (Tr. at 84).

If a person needed to lie down during the day, it would preclude employment only if the person had to lie down outside of the normally-scheduled breaks and lunch break (Tr. at 84-85).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Mary Leary entered her opinion on October 29, 2012 (Tr. at 12-27). Plaintiff's last insured date was September 30, 2012 (Tr. at 12, 14).

Step one. Plaintiff has not engaged in substantial gainful activity since her amended alleged onset date, January 21, 2011 (Tr. at 14).

Step two. Plaintiff has the following severe impairments: degenerative disc disease, major depressive disorder, high blood pressure, polysubstance dependence, mood disorder, and generalized anxiety disorder (Tr. at 14). Plaintiff's chest pain and ulcer are not severe impairments (Tr. at 15). Plaintiff's alleged breathing problem is not a medically-determinable impairment (Tr. at 15).

44

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-17).  Her substance abuse is "not material to the determination of disability, because the claimant, even with [her] substance abuse disorder, is not found to be disabled.  However, the claimant's substance abuse may affect other factors such as credibility of testimony." (Tr. at 17).

Step four.  Plaintiff retains the residual functional capacity to perform light work except that she can only occasionally climb, balance, stoop, kneel, crouch and crawl; cannot have concentrated exposure to vibration; can understand, remember and carry out only simple instructions and make only simple work-related decisions; can have only occasional changes in work processes and environment; cannot work around the general public; and can have only incidental, superficial work-related contact with co-workers (Tr. at 17).  Plaintiff's alleged symptoms were found only partially credible by the ALJ because plaintiff has not followed her doctor's treatment recommendations in that plaintiff was unable to have back surgery because she did not stop smoking, her primary care doctor discontinued treating plaintiff due to her behavior, another doctor refused to prescribe narcotic pain medication after plaintiff tested positive for marijuana and cocaine, plaintiff's drug screen was negative for her prescribed medication, MRI and x-rays did not support the alleged severity of her symptoms, she tested positive for illegal drugs which contradicted her allegations about her drug use, she is able to use public transportation, she goes to church and shops in stores, by the time of the hearing plaintiff was on no pain medication, and she testified inconsistently (Tr. at 17-24).

With this residual functional capacity plaintiff is capable of performing her past relevant work as a housekeeper (Tr. at 25).

Step five.  Alternatively, plaintiff is capable of performing other jobs available in significant numbers, such as photo copy machine operator, inserting machine operator, or solderer production (Tr. at 26).

VI.    *ADDITIONAL EVIDENCE SUBMITTED TO APPEALS COUNCIL*

Plaintiff argues that this case should be remanded for consideration of the Assessment for Vocational Rehabilitation completed by Dr. Cory Bethmann on February 11, 2013, and the Mental Residual Functional Capacity Form competed by Dr. Jairam Das on February 28, 2013, both of which were allegedly submitted to the Appeals Council as new and material evidence. The ALJ's decision was entered on October 29, 2012.  Plaintiff states in her brief that Dr. Jairam Das, a psychiatrist, began treating plaintiff in "approximately August 2012."  Dr. Das does not qualify as a treating physician, and there are absolutely no records -- treatment or assessment -- in this case from Dr. Das.

20 C.F.R. § 404.1502 defines a treating source as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.  In such a case, we will consider the acceptable medical source to be a nontreating source.

In this case, Dr. Das's alleged treatment of plaintiff began approximately two months before the ALJ rendered her opinion.  Even though significant medical records were submitted to the Appeals Council demonstrating plaintiff's treatment after the ALJ's decision, none were from Dr. Das and none dealt with plaintiff's mental impairment.  Further, the opinion of Dr.

46

Das to which plaintiff refers is not before me now. The only reference to Dr. Das's opinion appears in a letter written by plaintiff's previous disability attorney addressed to the Appeals Council (Tr. at 311-313). In that letter, plaintiff's attorney lists the "new and material" evidence which was being submitted to the Appeals Council. That evidence included "Burrell Behavior Health Records Dated August 22, 2012 - February 7, 2013" and "Mental Residual Functional Capacity Assessment Dated February 18, 2013." However, neither of those submissions were made a part of plaintiff's case and do not appear in the record before the District Court.

Plaintiff's former attorney states in her letter that Dr. Das is of the opinion that plaintiff would miss two or more days of work per month, that she would be expected to arrive at work late or leave work early two or more days a month because of her illness, and "limitations in the following areas would preclude performance for 15% of an 8 hour work day in the absence of substance abuse or alcohol abuse:" (1) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (2) completing a normal workday and workweek without interruptions from psychologically-based symptoms; (3) completing a normal workday without an unreasonable number and length of rest periods; and (4) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 312-313). No information was provided about Dr. Das's treatment, observations, or findings. No information was provided about the frequency of plaintiff's visits to him. No information was provided about whether he reviewed any of plaintiff's previous treatment records or whether and to what extent he relied on plaintiff's allegations in forming these opinions.

Based on the lack of any record at all from Dr. Das, he cannot be considered a treating psychiatrist.

47

When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, the court does not evaluate the Appeals Council's decision to deny review, but rather determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). Therefore, even assuming there was documentation supporting the opinion of Dr. Das as outlined by plaintiff's previous attorney in her letter to the Appeals Council, I find that the ALJ's determination is supported by the record as a whole, including the opinion of Dr. Das.

Following is the sum total of mental health evidence found in all of the medical records since plaintiff's alleged onset date: On June 8, 2011, in the emergency room plaintiff's mood and affect were normal. On July 7, 2011, she saw her psychiatrist, Dr. Bowers, and was stressed out due to living with other people in a small home and having problems with finances. Her mental status exam was normal except that her mood was sad. She saw Dr. Bowers on August 4, 2011, and reported that Celexa was helping her mood. Her mental status exam was normal except her mood was "kind of stressed." Later that month plaintiff told Dr. Halsey that Celexa had been helping with her mood. On September 27, 2011, she told Dr. Halsey that Celexa was working well. On that day plaintiff's drug test was positive for marijuana and cocaine.

On December 4, 2011, plaintiff went to the emergency room for her back, and her mood and affect were normal. She returned to see Dr. Bowers on January 9, 2012, and indicated that Dr. Halsey had refused to prescribe narcotics after plaintiff's positive drug test about 3 1/2 months earlier. Dr. Bowers noted that plaintiff's behavior was "slightly manipulative." She was assessed with dysthymic disorder "due to chronic pain."

On February 8, 2012, Dr. Bethmann noted that plaintiff had no unusual anxiety or evidence of depression. Later that month she reported tolerating all of her medications well.

48

Her depression and anxiety were listed as being under fair control and she exhibited no unusual anxiety or evidence of depression. On February 29, 2012, Dr. Bethmann noted that plaintiff's depression was doing poorly due to her chronic pain. The following month he noted no unusual anxiety or evidence of depression. Later that month plaintiff's urine tested positive for marijuana. In April 2012, her anxiety and depression were noted to be under fair control and she was observed to have no unusual anxiety or evidence of depression. Plaintiff had recently been put back on narcotic pain medication.

On May 2, 2012, plaintiff had an initial evaluation at Burrell Behavioral Health. Further testing was recommended to confirm any mental health diagnoses. There are no further records from Burrell. On May 16, 2012, plaintiff's depression and anxiety were noted to be stable, and she was observed to have no unusual anxiety or evidence of depression. Plaintiff reported daily use of marijuana and said she gets irritable when she does not use it. She falsely stated that she had not used cocaine in ten years. On June 22, 2012, plaintiff's depression and anxiety were noted to be under poor control, but she had not been taking her antidepressants regularly and had been having arguments with her husband.

The mental health evidence submitted to the Appeals Council consists of the following: Plaintiff continued to test positive for marijuana in August 2012. The Pain Management Clinic refused to prescribe anymore narcotic pain medication. On December 19, 2012, plaintiff's anxiety and depression were noted to be controlled with no symptoms.

The evidence in the record does not support the findings of Dr. Das as described by plaintiff's previous attorney.

Despite the sparsity of mental health evidence in the record, the ALJ found that plaintiff suffers from major depressive disorder, mood disorder, and generalized anxiety disorder, all severe impairments. The ALJ found that plaintiff has mild restriction in her activities of daily

49

living, as plaintiff primarily attributed her limitations to her physical condition. The ALJ found that plaintiff has moderate difficulties in social functioning and moderate difficulties with concentration, persistence or pace. As a result, the ALJ limited plaintiff to understanding, remembering and carrying out only simple instructions, making only simple work-related decisions, having only occasionally changes in work processes and environment, no working around the general public, and having only incidental, superficial work-related contact with her coworkers (Tr. at 17). No greater mental limitations are supported by this record.

On February 11, 2013, Cory Bethmann, M.D., completed a Residual Functional Capacity Assessment which was presented to the Appeals Council. He found that plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for less than 2 hours, and sit for at least 2 hours but less than 6 hours. He found that she could occasionally climb, balance, stoop, kneel, crouch, crawl, squat, twist and bend. He found that she could reach, handle, finger, feel and grasp without limitation (but as to grip strength he wrote a question mark). He found that she should avoid concentrated exposure to temperature extremes, working near chemicals/fumes, vibration, heights and machinery. By comparison, the ALJ found that plaintiff retains the residual functional capacity to perform light work except that she can only occasionally climb, balance, stoop, kneel, crouch and crawl and cannot have concentrated exposure to vibration. The Dictionary of Occupational Titles defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

Dr. Bethmann's finding that plaintiff cannot sit, stand and walk for a total of eight hours per day is the relevant finding since the rest of his assessment essentially mirrors the ALJ's assessment. I find that Dr. Bethmann's opinion in this Residual Functional Capacity Assessment is not supported by his own records or the other evidence in the record. A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

Plaintiff began seeing Dr. Bethmann on January 20, 2012. He treated her for hypertension. On February 8, 2012, her physical exam was normal, and her EKG was normal. Dr. Bethmann sent her to the emergency room due to her high blood pressure. At the ER, despite plaintiff denying drug use and reporting having stopped smoking two weeks earlier, her drug test was positive for marijuana and nicotine. On February 15, 2012, Dr. Bethmann described plaintiff's back pain as being under fair control. She had been to the Pain Management Clinic and told Dr. Bethmann that the epidural steroid injection helped her pain immensely. On February 29, 2012, plaintiff had uncontrolled hypertension but "no symptoms." On March 14, 2012, plaintiff's blood pressure was high but "asymptomatic." On April 16, 2012, plaintiff's physical exam was normal and Dr. Bethmann noted that plaintiff's back pain was "under fair control." On May 16, 2012, her blood pressure was under fair control, her physical exam was normal, and plaintiff reported daily use of marijuana. On June 22, 2012, Dr. Bethmann wrote, "Did complete housing form stating she is handicapped as a result of her back pain [illegible] she is disabled, this may help her get into housing sooner." There was no exam or treatment that day. On August 6, 2012, she had pain due to a broken tooth.

The evidence of Dr. Bethmann's treatment occurring after the ALJ's opinion consists of two visits. On October 9, 2012, Dr. Bethmann noted that plaintiff had violated the illicit drug policy and was no longer being prescribed narcotics by Dr. Ryan or Dr. Noble. Physical therapy was improving her pain. Plaintiff admitted not taking her hypertension medications regularly. On exam she had tight back muscles, normal memory, normal mood and affect, and a normal cardiovascular exam. He prescribed a muscle relaxer and made no changes to her hypertension medication. On December 19, 2012, Dr. Bethmann noted that other than tooth pain, plaintiff was "doing well." Her hypertension was well controlled with no symptoms. Her depression and anxiety were listed as controlled with no symptoms. Her physical exam was normal except "poor dentition" with a fractured tooth. Her neck was normal, memory was normal, mood and affect were normal, cardiovascular exam was normal. Plaintiff was reported to be "motivated" to quit using marijuana.

Dr. Bethmann was not the doctor who treated plaintiff's back pain. He treated her hypertension which he noted to be asymptomatic, whether it was under control or not. None of his records reflect any difficulty with sitting, standing or walking. In fact, as of her alleged onset date, plaintiff lived in an apartment on the third story and had no elevator. In September 2012 (less than five months before Dr. Bethmann's RFC assessment), plaintiff walked three miles to her physical therapy appointment. Although the records reflect that she was not able to do those things easily, there is nothing in the treatment records indicating that plaintiff was unable to sit, stand or walk for eight hours per day or that any doctor recommended she limit those activities, including Dr. Bethmann. In fact, Dr. Choma, plaintiff's orthopaedic surgeon, and Dr. Gov-Ari, her treating physician, both indicated that plaintiff was aware of her need to stay active in order to help her back pain.

To be material, new evidence must be non-cumulative, relevant, and probative of a claimant's condition during the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination. Krogmeier v. Barnhart, 294 F.3d 1019, 1025 (8th Cir. 2002). In this case, because Dr. Bethmann's residual functional capacity assessment was not supported by his own treatment records and is inconsistent with the records of plaintiff's treating orthopaedic surgeon and her other treating doctors, it is not entitled to controlling weight and would not have changed the Commissioner's decision.

VII. *FINDING AT STEP FOUR*

Plaintiff argues that the ALJ erred in finding that plaintiff could perform her past relevant work as a housekeeper because she did not make specific findings as to the physical and mental requirements of plaintiff's past work or make a comparison of her residual functional capacity to the requirements of her past work. The ALJ made an alternate finding at step five which is unchallenged by plaintiff except to the extent it is affected by the issue of new and material evidence submitted to the Appeals Council.

To the extent the ALJ committed any error at step four of the sequential analysis, such error was harmless inasmuch as the ALJ made an alternative finding at step five that plaintiff could perform other work in the national economy, a finding supported by the substantial evidence in the record. See Guranovich v. Astrue, 465 Fed. Appx. 541 (7th Cir. 2012), citing Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010); Getch v. Astrue, 539 F.3d 473, 481 (7th Cir. 2008); Cadena v. Astrue, 365 Fed. Appx. 777, 780 (9th Cir. 2010), citing Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008); Murrell v. Shalala, 43 F.3d 1388, 1389-1390 (10th Cir. 1994). See also Hewitt v. Colvin, 2015 WL 1286309 (E. D. Mo., March 20, 2015) ("Although the ALJ found at Step 4 of the analysis that Hewitt could perform his 'past relevant

work' as a trash collector, she nevertheless continued in her analysis and alternatively found at Step 5 that Hewitt could perform other work as it exists in significant numbers in the national economy, and specifically, laundry worker, cleaner, and kitchen helper. Hewitt makes no challenge to this Step 5 determination. Accordingly, to the extent the ALJ committed any error at Step 4 of the sequential analysis, such error was harmless inasmuch as the ALJ made an alternative finding at Step 5 that Hewitt could perform other work in the national economy."); Julian v. Colvin, 2015 WL 1257790 (E. D. Mo., March 18, 2015) ("If an ALJ reaches a finding at Step Four that is not supported by the evidence, then the ALJ's finding at Step Five will be upheld [citing Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008)]); Murphy v. Colvin, 7 F. Supp. 3d 917, 924 (N. D. Iowa 2014) ("[T]he ALJ's alternative, Step Five findings are supported by substantial evidence in the record as a whole. Thus, I agree with the Commissioner that any error at Step Four would be harmless error. Even if Murphy had no past work that qualifies as 'past relevant work,' there would be no need to remand this case for a Step Five determination because the ALJ has already made that determination. Reversal and remand is not required with regard to an error by the ALJ that does not affect the outcome of the claim. See, e.g., Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008)); Williams v. Colvin, 2014 WL 348587 (E.D. Mo., January 31, 2014) ("However, the ALJ continued in her analysis and alternatively made a Step 5 finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, assembly worker and dishwasher/kitchen helper. . . . [S]ubstantial evidence on the record as a whole supports the ALJ's alternative finding at Step 5 that plaintiff could perform other work in the national economy as an assembly worker. As such, the challenged errors committed by the ALJ at Step 4 were harmless and do not require remand. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)); Spainhour v. Astrue, 2012 WL 5362232 (W.D. Mo., October 30, 2012); Cole v.

54

Astrue, 2011 WL 1297509 (E. D. Mo, March 31, 2011);  Gray v. Astrue, 2008 WL 4816986

(W.D. Mo., October 28, 2008).

**VIII.    CONCLUSIONS**

Based on all of the above, I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 30, 2015